**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ANISSA GARCIA, | ) | CASE NO.  4:10-cv-56 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Anissa Garcia, challenges the final decision of Defendant, Michael J.

Astrue, Commissioner of Social Security (the "Commissioner"), denying Plaintiff's

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* (the "Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to the consent of the parties entered under the authority of

28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Commissioner's final decision is REVERSED

and REMANDED to the Social Security Administration for further proceedings.

# I.  PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on January 29, 2002, alleging a disability onset date of January 1, 2002.  Her applications were denied initially and upon reconsideration, so she requested a hearing before an administrative law judge ("ALJ").  Plaintiff's hearing was held on February 16, 2005.  The ALJ found Plaintiff not disabled on July 5, 2005, and the Appeals Council declined to review the ALJ's decision.

On April 6, 2006, Plaintiff filed a claim in the United States District Court for the Northern District of Ohio to challenge the final decision of the Commissioner:  *Garcia v. Commissioner of Social Security*, case number 4:06-cv-807.  On January 30, 2007, the Magistrate Judge issued a Report and Recommendation and recommended that the case be remanded to the Social Security Administration for further proceedings.  *Garcia, 4:06-cv-807, Doc. No. 20.*  On February 23, 2007, the District Judge adopted the Magistrate Judge's recommendation.  *Garcia, 4:06-cv-807, Doc. No. 23.*

On November 2, 2005, before the District Court ruled on Plaintiff's case, Plaintiff filed a second set of applications for DIB and SSI and alleged a disability onset date of January 2, 2005.  (Tr. 753.)  These applications were denied initially and upon reconsideration, and Plaintiff again requested a hearing before an ALJ.  (Tr. 296.)  On February 25, 2009, a hearing was held, wherein Plaintiff amended her disability onset date to May 1, 2002.  (Tr. 750, 758.)  On April 3, 2009, the ALJ dismissed Plaintiff's second DIB application because the date that Plaintiff was last insured for benefits had expired before she filed that application.  (Tr. 296.)  Regarding Plaintiff's second SSI application, the ALJ found Plaintiff not disabled.  (Tr. 296.)

On May 7, 2009, over two years after the District Court remanded Plaintiff's case

to the Social Security Administration, the Appeals Council ordered that both of Plaintiff's sets of applications for benefits be consolidated and ordered a new hearing before an ALJ.  (Tr. 296.)  On August 20, 2009, an ALJ held Plaintiff's hearing on her consolidated applications for benefits.  (Tr. 296.)  The ALJ indicated that he was reviewing Plaintiff's claim "from scratch," as the Appeals Council had vacated all prior decisions and consolidated Plaintiff's applications.  (Tr. 784.)  Plaintiff was represented by counsel, and Plaintiff testified along with a vocational expert ("VE").  (Tr. 296, 782.)  On October 7, 2009, the ALJ found Plaintiff not disabled.  (Tr. 303.)  The Appeals Council declined to review the ALJ's decision; therefore, the ALJ's decision became the final decision of the Commissioner.  On January 12, 2010, Plaintiff filed this present action.  (Doc. No. 1.)

Plaintiff alleges three assignments of error:  (1) the ALJ erroneously failed to deem Plaintiff's migraine headaches a "severe impairment"; (2) the ALJ failed to fairly and fully develop the record to make a proper determination of whether Plaintiff's hearing impairment met or medically equaled a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P (the "Listings"); and (3) the ALJ improperly evaluated Plaintiff's credibility.

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was born on October 18, 1971, graduated from high school, and was thirty-seven years old at the time of her third and final hearing before the ALJ.  (Tr. 788, 801.)  Plaintiff's past relevant work includes work as a home attendant, cook helper, and cook.  (Tr. 801.)

3

### B.    Medical Evidence

#### 1.    Hearing Loss

Plaintiff has required the use of a hearing aid since she was twelve years old. (Tr. 789.)  At the time of her last hearing before an ALJ, she wore hearing aids in both ears.  (Tr. 790.)

On September 10, 2001, Plaintiff underwent a hearing test with licensed audiologist Dr. Anne L. White, M.S.  (Tr. 131.)  Dr. White indicated that Plaintiff suffered "moderate to severe sloping sensori-neural hearing loss bilaterally," with speech discrimination scores of 52% in the right ear and 48% in the left ear.  (Tr. 131.)  Dr. White recommended that Plaintiff obtain binaural hearing aids and indicated that Plaintiff intended to request two in-the-ear hearing aids from Medicaid.  (Tr. 131.)

On March 21, 2002, state agency reviewing physician Dr. Myungi Cho, M.D., performed a residual functional capacity ("RFC") assessment of Plaintiff and indicated speech discrimination scores of 52 % and 48 %.[1]  (Tr. 142, 145.)  On July 29, 2002, state agency reviewing physician Dr. Jeffrey Vasiloff, M.D., affirmed Dr. Cho's findings.  (Tr. 145.)

Apparently, Plaintiff was able to obtain only one hearing aid—for her right ear—as Plaintiff again underwent a hearing test on October 7, 2002, to obtain funding for a second hearing aid.  (Tr. 130.)  Dr. White performed the second hearing test and reported that Plaintiff suffered "severe to profound sensori-neural hearing loss bilaterally."  (Tr. 130.)  Plaintiff's speech discrimination scores were 40% in the right ear

---

[1] Dr. Cho did not indicate to which ear the speech discrimination scores related.

4

and 44% in the left ear.  (Tr. 129, 130.)  Dr. White recommended that Plaintiff obtain a hearing aid for her left ear.  (Tr. 130.)

It appears that Plaintiff did not obtain a hearing aid for her left ear after her hearing test in 2002, as on April 21, 2003, Plaintiff underwent another hearing test with Dr. White to obtain funding for a second hearing aid.  (Tr. 127.)  Dr. White again indicated that Plaintiff suffered "severe to profound sensori-neural hearing loss bilaterally," with speech discrimination scores of 40% in the right ear and 44% in the left ear.  (Tr. 127.)  Dr. White again recommended that Plaintiff obtain a hearing aid for her left ear.  (Tr. 130.)

On April 16, 2004, Plaintiff underwent a hearing test performed by licensed audiologist Dr. Sarah Lallathin, M.D.  (Tr. 153.)  It appears that Plaintiff still had not yet obtained a hearing aid for her left ear, as Dr. Lallathin indicated that Plaintiff wore a hearing aid only in her right ear, which had been purchased by Medicaid in 2001.  (Tr. 153.)  Dr. Lallathin reported that Plaintiff suffered "moderate sloping to profound senorineural hearing loss in both ears," with speech reception thresholds at 75 decibels in the right ear and 55 decibels in the left ear.  (Tr. 153.)  Dr. Lallathin did not report speech discrimination scores, but indicated only that "Speech discrimination scores were poor in both ears."  (Tr. 153.)  However, it appears that Dr. Lallathin indicted on Plaintiff's audiology chart that Plaintiff had speech discrimination scores of 32% to 23% in her right ear, and 40% in her left ear.[2]  (Tr. 154.)  Dr. Lallathin recommended that

---

[2] These *apparent* speech discrimination scores are indicated in the "Speech Audiometry" table at the bottom-left side of Plaintiff's audiology chart, in the row titled "%PB."  (Tr. 154.)  It is not clear whether these scores officially represent "speech discrimination scores"; however, a review of Plaintiff's previous charts

Plaintiff obtain a hearing aid for her left ear.  (Tr. 153.)

On February 24, 2006, Plaintiff underwent a hearing test with Dr. Christy Pappas, Au.D, doctor of audiology.  (Tr. 656.)  Plaintiff still had not obtained a hearing aid for her left ear, as Dr. Pappas indicated that Plaintiff reported she wore a hearing aid in her right ear only and was interested in obtaining a hearing aid for her left ear.  (Tr. 656.) Dr. Pappas indicated that Plaintiff suffered "moderate-severe sensorineural hearing loss," and that Plaintiff's speech reception thresholds "were in good agreement with pure tone averages bilaterally."  (Tr. 656.)  Dr. Pappas did not report Plaintiff's specific speech reception thresholds, and did not report speech discrimination scores, but indicated only that "Word discrimination scores were poor bilaterally."  (Tr. 656.) However, it appears that Dr. Pappas indicated on Plaintiff's audiology chart that Plaintiff had speech reception thresholds of 70 decibels in her right ear and 60 decibels in her left ear; and that Plaintiff had speech discrimination scores of 56% in her right ear and 40% in her left ear.  (Tr. 657.)  Dr. Pappas recommended that Plaintiff obtain a hearing aid for her left ear.  (Tr. 656.)

On January 2, 2007, state agency reviewing physician Dr. Maria P. Congbalay, M.D., performed a residual functional capacity assessment of Plaintiff based on Plaintiff's medical records.  (Tr. 472-79.)  Regarding Plaintiff's hearing ability, Dr. Congbalay indicated that Plaintiff's hearing was limited; and that Plaintiff should avoid work in noisy environments where conversation is part of the job, unless such

---

indicates that the scores reported in the "%PB" row of the Speech Audiometry table correlate to the speech discrimination scores reported by some of Plaintiff's audiologists, which suggests that the scores indicated in the "%PB" rows are speech discrimination scores.  (*See, e.g.*, Tr. 131, 134.)

conversations were one-on-one in close proximity so that Plaintiff could read lips and have matters repeated (Tr. 476).  Dr. Congbalay further indicated that Plaintiff's allegations of the intensity, persistence, and functionally limiting effects of the symptoms are not substantiated by the objective medical evidence.  (Tr. 477.)

On January 23, 2008, Plaintiff underwent a hearing test with Dr. Tiffany Baltes/Wagar, Au.D., doctor of audiology.  (Tr. 652.)  Dr. Baltes/Wagar indicated that Plaintiff suffered "moderate sloping to profound sensorineural hearing loss, bilaterally." (Tr. 652.)  Although Dr. Baltes/Wagar indicated that Plaintiff's speech reception thresholds "were in good agreement with puretone averages," Dr. Baltes/Wagar did not report Plaintiff's specific speech reception thresholds or puretone averages, and did not report speech discrimination scores.  Dr. Baltes/Wagar only reported that Plaintiff's "Discrimination abilities were extremely poor, bilaterally."  (Tr. 652.)  However, it appears that Dr. Baltes/Wagar indicated on Plaintiff's audiology chart that Plaintiff's speech discrimination scores were 40% in her right ear and between 28% and 32% in her left ear.[3]  (Tr. 653.)  Dr. Baltes/Wagar further reported that Plaintiff's test results were similar to those from the testing performed on February 24, 2006, except that the present testing indicated that there was "a significant decrease in word recognition scores."  (Tr. 652.)  Although Dr. Baltes/Wagar indicated that Plaintiff's present style of hearing aid was inappropriate for Plaintiff's condition, Dr. Baltes/Wagar reported that

---

[3] It appears that Plaintiff had obtained a hearing aid for her left ear by the time Plaintiff tested with Dr. Baltes/Wagar, as Dr. Baltes/Wagar appears to have indicated that Plaintiff's speech discrimination score rose to 32% in her left ear when Plaintiff wore a binaural hearing aid, and recommended that Plaintiff continue using binaural hearing aids.  (Tr. 652.)

7

Plaintiff declined a different style of hearing aid.  (Tr. 652.)

On March 6, 2009, Plaintiff underwent a hearing test with audiologist Carrie

Boyd, M.A.  (Tr. 677.)  Ms. Boyd reported that Plaintiff "presented with a long-standing

severe sensori-neural hearing loss, bilaterally."  (Tr. 677.)  Ms. Boyd did not report

speech discrimination scores, and Plaintiff's audiology chart provided no indication of

speech discrimination or other scores.  (Tr. 677-78.)  Ms. Boyd only recommended that

Plaintiff obtain annual hearing evaluations.  (Tr. 677.)

### 2.    Back Pain and Other Symptoms

On November 11, 2004, Dr. Michael Levey, M.D., performed an MRI of Plaintiff's

lumbar spine upon referral from Plaintiff's treating physician, Dr. Nanette Vandevender,

D.O., and in response to Plaintiff's complaints of back pain radiating to her left buttock

and down her left leg.  (Tr. 210.)  The MRI indicated a small left-sided disc protrusion at

L5-S1 with disc material abutting the left S1 nerve root.  (Tr. 210.)

On January 4, 2005, Plaintiff presented to Dr. Vandevender, who reported that

Plaintiff suffered back and leg pain, refilled Plaintiff's Vicodin prescription, prescribed

Neurontin medication, and noted that Plaintiff had been referred for pain management.

(Tr. 224.)  Plaintiff subsequently receive pain management at the Doctors Pain Clinic

throughout 2005 and 2006.  (Tr. 459-66.)

On January 18, 2005,  Plaintiff presented to the Doctors Pain Clinic upon referral

from Dr. Vandevender, and was examined by Dr. Tracey L. Neuendorf, D.O.  (Tr. 225A-

227.)  Dr. Neuendorf indicated that Plaintiff had a positive straight leg raise test on the

left leg at 52 degrees.  (Tr. 226.)  Dr. Neurendorf further indicated that Plaintiff's spinal

examination showed "significant muscle spasm, trigger point activities and decreased

8

range of motion in the lumbar spine on all three planes."  (Tr. 226.)  Dr. Neuendorf diagnosed Plaintiff with low back pain, lumbar sprain and strain, lumbar radiculopathy down the left leg, a herniated disc at L5-S1, and migraine headaches.  (Tr. 226.)  Per Plaintiff's request, Dr. Neuendorf recommended the following treatment plan for Plaintiff's pain:  continue low-velocity home exercise and physical therapy; continue ongoing conservative care with Dr. Vandevender; and receive three therapeutic lumbar epidural injections.  (Tr. 226.)

On February 10, 2005, Plaintiff presented to Dr. Vandevender with complaints of cervical, dorsal radiculopathy down both of her arms.  (Tr. 236.)  Dr. Vandevender noted that Plaintiff had a history of impaired hearing and disc degeneration, and now suffered cervical dorsal neuritis.  (Tr. 236.)  Dr. Vandevender prescribed Plaintiff Neurontin, Zanaflex, and Tylenol No. 4.  (Tr. 236.)

On February 13, 2006, Plaintiff underwent discogram surgery on the L3-L4 and L4-L5 vertebrae of her spine.  (Tr. 577.)  Dr. Neuendorf performed the surgery and indicated that there were no complications.  (Tr. 577.)  Dr. Neuendorf reported that Plaintiff suffered a "dramatically positive discogram" at her L5-S1 vertebra, indicating a small protruding disc that "reproduced her low back pain and radicular symptoms all the way down the left [leg] to the foot, very consistent with her normal clinical pain pattern." (Tr. 579.)  Dr. Neuendorf also reported that Plaintiff suffered "a positive provocative discogram at L4-L5, but to a lesser degree of severity, with reproduction of back pain with referred pain into the left buttocks."  (Tr. 579.)  Dr. Neuendorf awaited the results of a post-discogram CT scan before exploring the possibility of surgery to decompress Plaintiff's L5-S1 disc (*i.e.*, nucleoplasty).  (Tr. 579.)

9

On May 12, 2006, Plaintiff underwent nucleoplasty to decompress her L5-S1 disc.  (Tr. 518-520.)  The procedure was performed by Dr. Neuendorf, and Dr. Neuendorf reported that, following the procedure, Plaintiff "at no time had any difficulties, dysesthesias, or problems with pain."  (Tr. 520.)  During a follow-up examination on May 18, 2006, however, Plaintiff reported that she had not experienced any decrease in her pain since the nucleoplasty.  (Tr. 453.)  Ms. Mary Giardina, R.N., attended Plaintiff at the follow-up and indicated that Plaintiff continued to complain of constant low back pain that radiated down both legs to her toes, with the pain in her left leg worse than in the right leg.  (Tr. 453.)  Ms. Giardina further indicated that Plaintiff would be placed on a post-nucleoplasty exercise program at Plaintiff's next follow-up. (Tr. 453.)

Plaintiff continued to receive pain management at the Doctors Pain Clinic into 2007. (*See* Tr. 447-452, 584-92.)  During Plaintiff's visit to the Clinic on May 30, 2006, Plaintiff reported that she had no side effects from her pain medications, and that her medications were helping to decrease her pain.  (Tr. 452.)  During Plaintiff's visit to the Clinic on June 27, 2006, Dr. Neuendorf reported that Plaintiff continued to complain of pain in her left lower back that radiated downward through her left leg and into her left foot; and that Plaintiff believed her nucleoplasty mitigated her pain by 40%.  (Tr. 451.) Dr. Neuendorf recommended that Plaintiff obtain three caudal block treatments.  (Tr. 451.)

During Plaintiff's visit to the Doctors Pain Clinic on July 26, 2006, Dr. Trinnetta D. Masternick, D.O., reported that Plaintiff continued to complain of pain, and that Plaintiff indicated that she did not want to obtain any more caudal block treatments because the

last one she obtained from Dr. Neuendorf made her dizzy and nauseous, and caused her more pain.  (Tr. 450.)  Dr. Masternick further reported that Plaintiff indicated her medications were not helping her pain anymore, and that Plaintiff wanted Dr. Masternick to understand that, although Plaintiff did not appear in pain when she walked, she suffered worse pain when she sat or laid down.[4]  (Tr. 450.)

On August 16, 2006, Plaintiff continued to complain of pain in her legs, back, and neck.  (Tr. 592.)  Plaintiff reported to Dr. Masternick that her medications were not reducing all of her pain.  Dr. Masternick reported that Plaintiff refused to submit to any more caudal treatments at that time.  (Tr. 592.)  Dr. Masternick further indicated that there were no problems at the site of Plaintiff's nucleoplasty, but also that Plaintiff's range of motion remained diminished in all planes of her lumbar spine.  (Tr. 592.)

On September 13, 2006, Dr. Masternick reported that Plaintiff was upset because, although she had been complaining of pain for months by that time, the Doctors Pain Clinic had done nothing about it.  (Tr. 590.)  Dr. Masternick indicated that this meeting "was a much better visit" because Plaintiff's husband did not attend the visit with Plaintiff.  (Tr. 590.)  Dr. Masternick reported that Plaintiff was hard to understand because of her poor hearing, and that Plaintiff admitted she could not read and did not know what procedures she had undergone.  (Tr. 590.)  Dr. Masternick indicated, and Plaintiff agreed, that Plaintiff required long-lasting pain medications to control her pain.  (Tr. 590.)  Dr. Masternick further indicated that she would start Plaintiff on a Duragesic

---

[4]  Dr. Masternick noted that Plaintiff's husband did most of the talking at Plaintiff's July 26, 2006, visit to the Doctors Pain Clinic; and that, when Dr. Masternick asked Plaintiff how her pain was, Plaintiff's only statements were that her pain was "horrible," and that the caudal treatments made her pain worse.  (Tr. 450.)

11

patch.  (Tr. 590.)

On September 27, 2006, Plaintiff underwent an MRI of her cervical and thoracic spine at the Cleveland Clinic upon referral from Dr. Masternick.  (Tr. 468.)  The MRI indicated mild spondylosis from Plaintiff's C4-5 to C6-7 vertebrae (Tr. 469), and disc herniations at Plaintiff's T7-8, T8-9, and T9-10 vertebrae (Tr. 471).

On October 10, 2006, Plaintiff saw Dr. Neuendorf at the Doctors Pain Clinic for further evaluation of her pain and to review Plaintiff's recent MRI.  (Tr. 589.)  Dr. Neuendorf indicated that Plaintiff complained of chronic low back pain down both legs and in the left hip, as well as pinching neck pain that spread down her left arm.  (Tr. 589.)  Plaintiff reported that she could not tolerate her Duragesic patch (Tr. 589); apparently, she suffered an allergic reaction to the patch (Tr. 587).  Dr. Neuendorf diagnosed seven impairments:  protruding discs at the C4-5, C5-6, C6-7, T7-8, T8-9, and T9-10 vertebrae; spondylosis of the spine; low back pain; lumbar sprain and strain; lumbar radiculopathy down the left leg; a herniated disc at the L5-S1 vertebra; and migraine headaches.  (Tr. 589.)

On November 8, 2006, Plaintiff visited the Doctor's Pain Clinic with her husband.  (Tr. 587.)  Apparently, Plaintiff's husband did most of the talking with Dr. Masternick.  (Tr. 587.)  Although Plaintiff reported that she did not attend a recent physical therapy session because she had to take her son to the emergency room, Dr. Masternick reported that Plaintiff's husband believed physical therapy would not help Plaintiff.  (Tr. 587.)  Plaintiff's husband also reportedly asserted that Plaintiff would not receive any more epidural treatments.  (Tr. 587.)  Plaintiff reportedly indicated that she wanted to change her medications because her medications were not working.  (Tr. 585.)  Dr.

12

Masternick asked Plaintiff's husband to leave the room and then suggested that Plaintiff see a doctor in Cleveland, but Plaintiff's husband overheard that suggestion and insisted that Plaintiff would not go to Cleveland because the doctors would only try to take Plaintiff off her medication and say that her pain was psychosomatic.  (Tr. 587.) Dr. Masternick indicated that she would continue Plaintiff on some of her pain medications, but strongly recommended that Plaintiff continue her physical therapy.  (Tr. 587.)

On December 8, 2006, Plaintiff saw Dr. James A. Weiss, M.D., at the Doctors Pain Clinic.  (Tr. 586.)  Dr. Weiss noted Plaintiff's complaints of pain, and indicated that Plaintiff had not yet received transforaminal steroid placement on the left side of her L5 vertebra.  (Tr. 586.)  Dr. Weiss's treatment plan was an L5 transforaminal injection, a local anesthetic, and steroids along with Plaintiff's present medications.  (Tr. 586.)

On January 2, 2007, state agency reviewing physician Dr. Maria P. Congbalay, M.D., performed a residual functional capacity assessment based on Plaintiff's medical records.  (Tr. 472-79.)  Regarding Plaintiff's physical ability to work, Dr. Congbalay indicated that Plaintiff could occasionally lift ten pounds and frequently lift less than ten pounds; stand and/or walk for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and pull without limitation except regarding limitations to her ability to lift; occasionally climb ramps and stairs; and never climb ladders, ropes, or scaffolds.  (Tr. 473-74.)  Dr. Congbalay indicated that her RFC was adopted from that determined in the prior decision of the Social Security Administration dated July 5, 2005.  (Tr. 473.)  Dr. Congbalay further indicated that Plaintiff's allegations of the intensity, persistence, and functionally limiting

13

effects of her symptoms were not substantiated by the objective medical evidence.  (Tr. 477.)

On January 8, 2007, Plaintiff saw Dr. Masternick at the Doctors Pain Clinic.  (Tr. 585.)  Dr. Masternick reported that Plaintiff underwent her first transforaminal epidural injection, and that Plaintiff reported that the epidural helped alleviate the pain for only a few days.  (Tr. 585.)  Dr. Masternick also indicated that Plaintiff reported that her medications made her pain more tolerable, and that Plaintiff suffered no side effect from her medications.  (Tr. 585.)  Dr. Masternick further indicated that Plaintiff would undergo two more transforaminal epidural injections.  (Tr. 585.)

On February 7, 2007, Plaintiff saw Dr. Weiss at the Doctors Pain Clinic.  (Tr. 584.)  Dr. Weiss indicted that Plaintiff's pain relief has been inadequate, and that he would refer Plaintiff back to Dr. Vandevender to consider whether Plaintiff should undergo a spine surgical consultation.  (Tr. 584.)

On May 24, 2007, Plaintiff presented to Dr. Brian P. Brocker, M.D., upon referral from Dr. Vandevender.  (Tr. 614-17.)  Dr. Brocker diagnosed Plaintiff with a herniated disc at the L5-S1 vertebra and recommended conservative treatment that included more epidural injections and Percocet.  (Tr. 615-16.)

On January 23, 2008, Plaintiff reported to Dr. Baltes/Wagar (who had performed a hearing test on Plaintiff) that she had suffered a back injury two years prior that reportedly caused pressure and pain in her right ear, which would develop into migraine headaches.  (Tr. 652.)

On May 21, 2008, Plaintiff presented to Dr. Vendevender with continued complaints of pain.  (Tr. 670.)  Plaintiff reported that she began suffering migraine

14

headaches again and that she could not tolerate her Topamax medication.  (Tr. 670.)

Dr. Vandevender indicated that surgery was not planned at that time, and that Plaintiff

refused to participate in pain management again.  (Tr. 670.)  Dr. Vandevender

recommended that Plaintiff be placed in physical therapy again, that Plaintiff try a TENS

unit[5], and that Plaintiff try Neurontin medication.  (Tr. 671.)

On November 5, 2008, December 4, 2008, and January 14, 2009, Plaintiff

presented to Dr. Brocker with complaints of neck, shoulder, and arm pain with

headaches, low back pain, left hip pain, and leg pain.  (Tr. 674-76.)  Dr. Brocker again

recommended conservative treatment including medications, physical therapy, and

epidural injections.  (Tr. 674.)

On August 24, 2009, Dr. Vandevender completed a medical source statement of

Plaintiff's physical functional capacity.  (Tr. 687-88.)  Dr. Vandevender indicated

Plaintiff's physical capacities as follows.  Plaintiff could occasionally lift and carry only

1/3 pounds; stand and walk for only one hour in an eight-hour workday, and for thirty

minutes at a time without interruption; and sit for only fifteen minutes at a time in an

eight-hour workday, and for twenty minutes without interruption.  (Tr. 687.)  Plaintiff

could rarely balance and stoop, and never climb, crouch, kneel, or crawl.  (Tr. 687.)

Plaintiff could frequently reach and feel, but could rarely to never handle objects, push

and pull, and perform fine and gross manipulation.  (Tr. 688.)  Plaintiff could work in an

environment that had chemicals, dust, and fumes, but could not work in an environment

---

[5] "TENS" stands for "transcutaneous electrical nerve stimulation."  The Merck
Manual of Diagnosis and Therapy 2495 (Mark H. Beers, MD., & Robert Berkow,
M.D., eds., 7th ed. 1999).  The treatment uses low-frequency electrical currents
to stimulate nerves and reduce pain.  *Id.*

that had heights, moving machinery, extreme temperatures, and noise.  (Tr. 688.)
Plaintiff required a sit/stand option in any working environment.  (Tr. 688.)  Dr.
Vandevender also indicated that Plaintiff suffered severe pain, and that her disc
problems and hearing impairment would interfere with her ability to work.  (Tr. 688.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Because Plaintiff had difficulty hearing, the ALJ allowed Plaintiff's attorney to
question Plaintiff during her hearing, as Plaintiff's attorney was closer to Plaintiff and
Plaintiff would better be able to hear and read the attorney's lips.  (Tr. 786.)  Plaintiff's
attorney agreed that the thrust of Plaintiff's claim was her orthopedic problems and her
hearing difficulty.  (Tr. 787.)  Plaintiff testified to her limitations as follows.

Plaintiff required hearing aids since she was twelve years old.  (Tr. 789.)  Her
hearing has become worse over time.  (Tr. 789.)  Plaintiff presently required hearing
aids in both ears.  (Tr. 790.)

While Plaintiff was employed, she received only hearing tests because she could
not afford treatment or replacement hearing aids.  (Tr. 790.)  Since she had children,
however, she has been able to obtain replacement hearing aids through Medicaid.  (Tr.
790.)

Even when she is using her hearing aids, Plaintiff is unable to hear the television
and needs to use closed captions to understand television programs.  (Tr. 790.)  She is
unable to hear the telephone ring, and she is unable to speak over the telephone
because she cannot hear callers' voices.  (Tr. 791.)  Plaintiff requires her husband to
translate to her what callers say over the phone.  (Tr. 791.)  Furthermore, she is unable

16

to hear casual conversation among her family members even when she is in the same room.  (Tr. 791.)  When her family members speak to her, they speak slowly so that she can understand them.  (Tr. 791-92.)

Plaintiff's left hearing aid is not fitted properly and this affects both ears, so her hearing in both ears is not optimal.  (Tr. 792.)

Plaintiff stopped working in 2002 because of her back problems.  (Tr. 792.)  The pain began in her lower back; over time, however, the pain spread down her left leg and into her left foot, causing tingling numbness and stabbing, pinching pain.  (Tr. 793.)  The pain then spread up to her shoulders and neck, causing her migraine headache pain. (Tr. 793.)  The pain then spread down her arms and into her hands.  (Tr. 793.)

Plaintiff takes pain medications.  (Tr. 793.)  She tried epidural injections and physical therapy to mitigate her pain, but these treatments did not work.  (Tr. 793-94, 796.)

At home, Plaintiff is able to wash dishes on occasion if there are not many dishes to wash, but if her pain acts up she becomes irritable and decides not to do them.  (Tr. 794.)  Plaintiff's husband helps with the housework.  (Tr. 794.)  It is difficult for Plaintiff to walk up and down the steps into her basement because such walking bothers her left hip.  (Tr. 794.)  Most of the time, Plaintiff becomes tired and lays in bed.  (Tr. 794.)  When Plaintiff suffers bad migraine headaches, she is unable to function or think clearly.  (Tr. 794.)

Plaintiff's pain prevents Plaintiff from sitting for long periods of time.  (Tr. 795.)  Plaintiff often has to reposition herself to sit up straight, or stand up and move around, to mitigate her discomfort and pain.  (Tr. 795.)  However, sometimes her pain prevents

17

her from standing, such as by causing her leg to give out.  (Tr. 795.)

When the ALJ raised concerns about Plaintiff's non-compliance with her physicians' treatment recommendations, such as continuing epidural injections and physical therapy, Plaintiff's attorney explained that Plaintiff did not continue such treatments because of financial difficulties and the belief that such treatments were not working.  (Tr. 796.)  Furthermore, although Plaintiff's physician advised Plaintiff that her hearing aids were inappropriate for her condition and that she should obtain different hearing aids, Plaintiff's counsel explained that Plaintiff declined to obtain the recommended hearing aids because she could not afford them.  (Tr. 797.)

### 2.    Vocational Expert Testimony

The ALJ posed the following hypothetical person to the VE:

> Well, lets assume we have an individual currently 37 years of age, high school education, work experience that you have defined and described. Let's assume once again that she's limited to sedentary work and would not be able to engage in work that required the operation of foot controls.  She would not be able to engage in crawling, kneeling, climbing, or balancing on heights.  She would not be able to engage in work that required squatting. She would not be able to engage in repeated bending at the waist to 90 degrees.  She would not be able to work in a loud noise environment.  She would not be able to do telephone type work and I'm going to add that she couldn't engage in more than incidental interaction with the public and no teamwork.

(Tr. 801-802.)

The ALJ noted that such an individual could not perform Plaintiff's past relevant work and then asked the VE whether such an individual could perform other work.  (Tr. 802.)  The VE testified that such a person could work as a Ticket Checker (for which there were 100,000 positions in the national economy); Document Preparer (for which there were 100,000 positions in the national economy); and Addresser (for which there

18

were 50,000 positions in the national economy).  (Tr. 802.)

The ALJ then modified his hypothetical by providing that the hypothetical person would not be able to interact with the public.  (Tr. 803.)  The VE testified that this limitation would not preclude such a person from performing the jobs to which she testified.  (Tr. 803.)

The ALJ then modified his hypothetical by providing that the hypothetical person required a sit/stand option.  (Tr. 804.)  The VE testified that such a person could still perform all the jobs to which she testified.  (Tr. 804.)

The ALJ then modified his hypothetical further by providing limitations that the hypothetical person would be unable to report to work, or would be absent from work on an irregular or random basis, three or more times a month and for a period of time lasting for several months.  (Tr. 804.)  The VE testified that such a person would be precluded from all work in the national economy.

The ALJ's final modification to his hypothetical provided the limitation that the hypothetical person would be off task ten to fifteen percent of the workday, excluding usual, scheduled breaks, for an extended period of time.  (Tr. 804-805.)  The VE testified that such a person would be precluded from all work in the national economy. (Tr. 805.)

The VE further testified that her testimony was consistent with the Dictionary of Occupational Titles and other, alternative vocational sources.  (Tr. 805.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); Abbott v. Sullivan, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." Abbot, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national

20

economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2005.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2002, the alleged onset date.

3.    The claimant has the following severe impairments: degenerative disc disease involving the cervical, thoracic, and lumbar regions with radiculopathy, and bilateral senorineural hearing loss.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments.

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work. . . . However, the claimant cannot do any crawling, kneeling, climbing, or balancing, cannot operate foot controls or do any squatting, or bend at the waist to 90 degrees; cannot be exposed to heights and a loud noise environment; and cannot do any telephone work or work involving any interaction with the public; or any teamwork.

6.    The claimant is unable to perform any past relevant work.

. . . . .

9.    The claimant has no transferrable skills from past relevant work.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, the claimant can perform other jobs existing in significant numbers in the national economy.

11.    The claimant has not been under a disability, as defined by the Social Security Act, from May 1, 2002, through the date of this decision.

(Tr. 298-303.)

21

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, nor weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.    The ALJ's Determination of Severe Impairments

Plaintiff argues that the ALJ erred because he did not find that Plaintiff's migraine headaches were a severe impairment.  Although it is true that the ALJ did not find

22

Plaintiff's migraine headaches to be a severe impairment, such a failure is harmless error that does not warrant remand.

The determination of severity at the second step of a disability analysis is a *de minimis* hurdle in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Anthony v. Astrue*, 266 F. App'x 451. 457 (6th Cir. 2008).  The goal of the test is to screen out totally groundless claims.  *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir.1985).  Once the ALJ determines that a claimant suffers a severe impairment at step two of his analysis, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two would be only harmless error.  *Anthony*, 266 F. App'x at 457 (citing *Maziars v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).  However, all of a claimant's impairments, severe and not severe, must be considered at every subsequent step of the sequential evaluation process.  *See* C.F.R. § 404.1529(d); C.F.R. §§ 416.920(d).

Here, the ALJ found that Plaintiff suffered the following severe impairments at step two of his analysis:  degenerative disc disease involving the cervical, thoracic, and lumbar regions with radiculopathy, and bilateral sensorineural hearing loss.  Upon these findings, Plaintiff cleared step two of the analysis.  *See Anthony*, 266 F. App'x at 457.  The fact that Plaintiff's migraine headaches were not deemed a severe impairment at step two would be, at most, harmless error.  *See id.* (citing *Maziars*, 837 F.2d at 244).  Therefore, remand on this assignment of error is not appropriate.  *See id.*

**C.     The ALJ's Duty to Fairly and Fully Develop the Record**

Plaintiff argues that there was insufficient evidence of her current hearing ability

23

to make an accurate determination of whether Plaintiff's hearing deficits met or medically equaled one of the listed impairments in the Listings at Step Three of the ALJ's disability analysis, and that the ALJ failed to fairly and fully develop the record by not ordering a consultative examination or relying on a medical expert ("ME") to obtain updated hearing test scores or otherwise make sense of the record evidence before determining whether Plaintiff met the Listings.  For the reasons set forth below, the Court agrees that the ALJ failed to fairly and fully develop the record.

      If a claimant meets or medically equals one of the listed impairments in the Listings for the required durational period of time, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).  Here, the ALJ determined that Plaintiff's hearing impairment, although severe, did not meet or medically equal Listing 2.08, which regards hearing impairments.[6]  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 2.08 (Oct. 6, 2009).  Listing 2.08 is met when either (A) a claimant's average hearing threshold sensitivity for air conduction is 90 decibels or greater and for bone conduction to corresponding maximal levels, in the better ear, determined by the simple average of hearing threshold levels at 500, 1000, and 2000 hertz; or (B) speech discrimination scores are 40% or less in the better ear.  *Id.*  The ALJ explained that Plaintiff's hearing impairment did not meet or medically equal Listing 2.08 because Plaintiff's treating

---

[6]  The Listings regarding hearing loss were amended on June 2, 2010, and became effective on August 2, 2010.  75 F.R. 30693-01 (June 2, 2010).  The amendments eliminated Listing 2.08 and replaced it with a similar Listing 2.10. The Social Security Administration indicated that it expected "Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions."  *Id.* at 30693 n.1.  Therefore, the Court will review Plaintiff's claim regarding Listing 2.08 as it existed before the July 2, 2010 amendments.

physicians and other third-party observers did not report that Plaintiff's hearing impairment caused undue difficulty in interacting with Plaintiff; Plaintiff's "hearing testimony and demeanor were consistent with a finding that with the use of hearing aids, [Plaintiff] is still capable of performing a wide range of work with appropriate accommodations"; and "medical listing and medical equivalence have also been addressed in the reports from the state agency medical consultants with respect to the claimant's subsequent applications for benefits."  (Tr. 299, 301.)  As explained below, the ALJ's reasons for finding that Plaintiff's hearing impairment does not meet or medically equal the Listings do not support that conclusion.

The ALJ's observation that Plaintiff's treating physicians and other third-party observers did not report that Plaintiff's hearing impairment caused undue difficulty in interacting with Plaintiff is not accurate:  Dr. Masternick—who treated Plaintiff at the Doctor's Pain Clinic on several occasions—indicated that it was difficult to understand Plaintiff (Tr. 590); and the ALJ himself allowed Plaintiff's attorney to question Plaintiff during her third and final hearing because Plaintiff's hearing impairment prevented Plaintiff from adequately interacting with the ALJ (Tr. 786).

Plaintiff's hearing testimony and demeanor fail to support the conclusion that Plaintiff does not meet or medically equal Listing 2.08's speech discrimination score requirement because such scores appear to be derivative of objective medical testing. *See* 20 C.F.R. Pt. 404, Subpt. P, App. A, Sec. 2.00B(1) (Oct. 6, 2009).

The ALJ's conclusion that Plaintiff's hearing testimony and demeanor indicate that Plaintiff can perform a wide range of work when using hearing aids and if given appropriate accommodations is puzzling because the ALJ did not explain the basis of

25

this conclusion and, in contrast, the record indicates otherwise:  Plaintiff needed to communicate through her attorney at her hearing to adequately interact with the ALJ (Tr. 786); Plaintiff testified that her hearing continued to worsen (Tr. 789); and Plaintiff testified that, often times, her hearing aids did not help her (Tr. 790-92).

Furthermore, the reports from the state agency reviewing physicians do not support the conclusion that Plaintiff's hearing impairment does not meet or medically equal Listing 2.08.  The only state agency physicians who provided speech discrimination scores, Drs. Cho and Vasiloff, provided those scores in 2002.  (Tr. 142, 145.)  Dr. Cho indicated, and Dr. Vasiloff affirmed, that Plaintiff had speech discrimination scores of 52% and 48%.  (Tr. 142, 145.)  Because those scores were reported by state agency reviewing physicians, the scores appear to have been derived from Plaintiff's September 10, 2001, hearing test performed by Dr. Anne L. White.  (*See* Tr. 131.)  The other state agency reviewing physician who mentioned Plaintiff's hearing ability in 2007, Dr. Congbalay, indicated only that Plaintiff suffered limited hearing, and that her subjective allegations of her limitations were not supported by the objective medical evidence.  Dr. Congbalay did not indicate any speech discrimination scores or other objective evaluations of Plaintiff's ability to hear.  (Tr. 476-77.)

In contrast to the ALJ's bases for finding that Plaintiff's hearing deficit did not meet or medically equal the Listings, testing performed through 2009 indicated that Plaintiff's hearing was near Listing levels and continued to diminish, which suggests that Plaintiff's speech discrimination scores fell well below the threshold for meeting Listing 2.08.  On October 7, 2002, Dr. White indicated that Plaintiff had speech discrimination scores of 40% in the right ear and 44% in the left ear.  (Tr. 130.)  On April 21, 2003, Dr.

26

White repeated those scores.  (Tr. 127.)  On April 16, 2004, Dr. Lallathin, however, appears to have indicated on Plaintiff's audiology chart that Plaintiff's speech discrimination scores were further diminished:  32% to 23% in the right ear and 40% in the left ear.  (Tr. 154.)  And on January 23, 2008, Dr. Baltes/Wagar appears to have indicated on Plaintiff's audiology chart that Plaintiff's speech discrimination scores were 40% in the right ear and between 28% and 32% in her left ear.  (Tr. 653.)

The ALJ does not seem to have reviewed this evidence, as he did not mention this evidence in his Decision and did not consult a medical expert to make sense of this evidence.  This evidence bears directly on whether Plaintiff met or medically equaled Listing 2.08; that is, this evidence bears directly on whether Plaintiff is disabled.

Social Security proceedings are not adversarial in nature and are supposed to represent a search for the true state of facts as regards a claimant's ability to perform work.  *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 397 (6th Cir. 2010); *see Sayers v. Gardner*, 380 F.2d 940, 943 (6th Cir. 1967).  The courts have a direct responsibility to assure the reasonableness and fairness of the decisions of the federal agencies.  *Sayers*, 380 F.2d at 943.  Although reviews of the Commissioner's decisions may at times turn on questions of shifting burdens of persuasion, a claim that may determine the ability of an individual to maintain a decent way of life should not be denied by reason of a claimant's failure to present obviously relevant evidence.  Even though a claimant may be represented by counsel, the ALJ has the responsibility to explore whether critical evidence should be obtained.  *Cf. Thorne v. Califano*, 607 F.2d 218, 219-20 (8th Cir. 1979); *Coulter v. Weinberger*, 527 F.2d 224, 229 (3d Cir. 1975); *Hess v. Sec'y of Health, Educ., & Welfare*, 497 F.2d 837, 840 (3d Cir. 1974).  An ALJ

27

has the discretion to adjourn a hearing and to compel the production of necessary evidence.  *See* 20 C.F.R. §§ 404.944, 404.950(d); *Hess*, 497 F.2d at 837.  This obligation does not require the ALJ to move heaven and earth to secure all possible evidence, but it does call for some effort to obtain obviously important evidence in the event that counsel fails to do so.  It is the ALJ's duty to conscientiously develop a full and fair record.  *Wright-Hines*, 597 F.3d at 397 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)).

Here, the medical evidence is insufficient to support the ALJ's finding that Plaintiff's speech discrimination scores did not meet or medically equal Listing 2.08.  It was incumbent upon the ALJ to obtain updated medical evidence of Plaintiff's hearing ability because the outdated medical evidence in the record showed that Plaintiff was not only close to meeting the Listings, but that her condition had been deteriorating, and the more recent evidence of Plaintiff's hearing ability failed to quantify it.  Therefore, remand is necessary so that sufficient evidence of Plaintiff's hearing impairment can be obtained and the ALJ can determine whether Plaintiff's hearing impairment met or medically equaled Listing 2.08.

### D.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff argues that the ALJ made an improper credibility assessment of Plaintiff's subjective statements about her symptoms and limitations.  For the reasons set forth below, the Court agrees.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987).  The ALJ's credibility findings are entitled to considerable deference and should

not be discarded lightly.  See *Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so."  *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).  The ALJ's decision must contain specific reasons for his finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the claimant and to any subsequent reviewers the weight he gave to the individual's statements and the reasons for that weight.  S.S.R. 96-7p, 1996 WL 374186, at *1.

In determining the credibility of a claimant's statements, an adjudicator must consider the entire case record, including the objective medical evidence, the claimant's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.  *Id.* Although a claimant's description of her physical or mental impairments, alone, is "not enough to establish the existence of a physical or mental impairment," C.F.R. §§ 404.1528(a),  416.929(a), "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence," S.S.R. 96-7p, at *1.  The ALJ must consider the following factors:

> (i)    [D]aily activities;
> (ii)   The location, duration, frequency, and intensity of . . . pain;
> (iii)  Precipitating and aggravating factors;
> (iv)   The type, dosage, effectiveness, and side effects of any medication
>         . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures you use or have used to relieve . . . pain.

*Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); S.S.R. 96-7p, at *3.

Furthermore, the consistency of the evidence, including a claimant's subjective

statements, is relevant in determining a claimant's credibility.  20 C.F.R. § 404.1527(c);

S.S.R. 96-7p, at *5.

Here, the ALJ cited myriad reasons for finding that Plaintiff was not entirely

credible.  For example, the ALJ noted that:  Plaintiff was able to work for many years

despite her hearing problems; Plaintiff testified that she had to quit her last job because

of her back pain and not her hearing impairment; Plaintiff testified that her hearing

became only a "little" worse over time; Plaintiff did not require an assistive device to

walk or otherwise move about on a regular basis; Plaintiff was noncompliant with

aspects of her treatment regimen, as she discontinued physical therapy;[7] and Plaintiff

---

[7] The Commissioner provides further evidence of how Plaintiff was not fully
compliant with her treatment regimen and was not fully credible:  Dr.
Vandevender reported that Plaintiff refused to take antibiotics; Dr. Masternick
reported that Plaintiff refused to take nerve blocks and reprimanded Plaintiff for
taking her mother's pain medications when Plaintiff's pain medications ran out;
Plaintiff testified that she went to physical therapy only once; Dr. Brocker
reported that Plaintiff's medications relieved Plaintiff's pain; and Plaintiff
testified that her pain medications relaxed her and relieved her pain "a little bit."
(Def.'s Br. Opp'n 13.)  Although this evidence may weigh against Plaintiff's
credibility, the ALJ did not explain this evidence in his Decision. Therefore, such
a recitation of how the record evidence supports the ALJ's credibility
determination is purely conjecture on the part of counsel and cannot serve as
the basis for review by a court.  *See Watford v. Massanari*, No. 1:00-cv-00004,
at 13 (N.D. Ohio April 24, 2001); *see also Nat'l Labor Relations Bd. v. Ky. River
Cmty. Care, Inc.*, 532 U.S. 706, 715 n.1 (2001) (noting that counsel's *post hoc*
rationalizations are not substituted for the reasons supplied by the
administrative agency); *Sec. and Exch. Comm'n v. Chenery Corp.*, 332 U.S.
194, 196 (1947) ("[A] reviewing court, in dealing with a determination or
judgment which an administrative agency alone is authorized to make, must

was "alert and pleasant" when she presented to Dr. Vandevender in August 2006.  (Tr.

301.)  However, as explained below, some of these reasons, as well as the ALJ's other

reasons for finding Plaintiff incredible, are not well founded.

Although Plaintiff may not have required an assistive device to walk, the ALJ fails

to articulate how this fact relates to and weighs against Plaintiff's complaints of pain.

Furthermore, although Plaintiff may not have been totally compliant with her treatment

regimen, the ALJ fails to address the fact that some of Plaintiff's treatments, such as her

epidural injections and Duragesic patch, allegedly made her ill, and fails to address

Plaintiff's testimony that she could not afford new hearing aids.

The ALJ explained that "examinations by numerous physicians have failed to

show that the claimant has any consistent neuro-anatomic distribution of pain, motor

loss, atrophy, muscle weakness, and sensory or reflex loss of the severity to establish

the existence of a muskuloskeletal impairment that would preclude sedentary work"  (Tr.

301); however, this broad explanation appears at least partially inaccurate, as Plaintiff's

treating physicians consistently diagnosed Plaintiff with low back pain and

radiculopathy; indicated that Plaintiff suffered pain in her back, legs, hip, arms, and

neck; and indicated that Plaintiff suffered decreased range of motion in all three planes

of her back.

The ALJ indicated that Plaintiff has required only conservative treatment for her

pain and received multiple epidural injections, laser treatments, and radio frequency

---

judge the propriety of such action solely by the grounds invoked by the
agency."); *Sparks v. Bowen*, 807 F.2d 616, 617 (7th Cir. 1986) ("We must
evaluate the reason the ALJ gave.").

treatments.  (Tr. 301.)  The ALJ's observation that Plaintiff underwent only conservative treatment is not accurate, however, as Plaintiff underwent back surgery in 2006.  The ALJ never explained the significance of this surgery.  Furthermore, the ALJ noted that none of Plaintiff's treatments provided long-lasting relief.  (Tr. 301.)  Therefore, it is not clear whether Plaintiff's conservative treatment was actually conservative, and whether the evidence of such treatment leads to the conclusion that Plaintiff's pain is not as severe as Plaintiff claims.

The ALJ determined that Plaintiff was adequately able to communicate and interact with others because, as allegedly indicated in Exhibit 1F, a Social Security Administration district office representative was able to interview Plaintiff without undue difficulty (Tr. 301).  This observation is not accurate, as Exhibit 1F actually consists of Plaintiff's hearing tests from September 10, 2001, to April 21, 2003, and indicates that Plaintiff suffered "severe to profound sensori-neural hearing loss bilaterally."  (Tr. 126-36.)  Moreover, even if a  Social Security Administration district office representative did not suffer undue difficulty interviewing Plaintiff, the ALJ fails to articulate how this evidence outweighed the evidence that at least one of Plaintiff's treating physicians had difficulty communicating with Plaintiff (Tr. 590), and that the ALJ recognized that Plaintiff had difficulty communicating, as he allowed Plaintiff's attorney to question Plaintiff during her third and final hearing because Plaintiff's hearing impairment prevented Plaintiff from adequately interacting with the ALJ (Tr. 786).

The ALJ explained that "At each of her hearings, the claimant was able to present her case without any serious communication difficulties," (Tr. 301); however, this explanation is belied by the fact that the ALJ had Plaintiff's attorney question

32

Plaintiff during her third and final hearing because Plaintiff's hearing impairment prevented Plaintiff from adequately interacting with the ALJ (Tr. 786).

The ALJ explained that he had the opportunity to examine Plaintiff's appearance and demeanor on two occasions within a year and concluded that Plaintiff's allegations of disabling pain and side-effects from her medications were not credible because Plaintiff "did not show any signs of significant distress or drowsiness at her hearings." (Tr. 301.)  The ALJ then cited evidence from Dr. Brocker and Dr. Vandevender to support his observations and conclusion.  As explained below, this assessment was conclusory and, therefore, improper.

The ALJ explained that Dr. Brocker reported that Plaintiff was able to follow commands well, had intact memory and attention, and did not complain of significant impairment in gait, or leg or arm weakness.  Based on this evidence, the ALJ concluded that Plaintiff's "complaints of pain are not overwhelming."  (Tr. 301.)  The ALJ does not articulate how Plaintiff's intact memory and attention during that examination lead to the conclusion that her allegations of pain are incredible.  Certainly, disabling pain may be so severe as to impair a claimant's ability to exercise her memory and maintain attention, but the opposite is not necessarily true; that is, pain does not necessarily have to be so severe as to impair memory and attention to constitute disabling pain.  The ALJ also does not articulate how Dr. Brocker's report that Plaintiff did not complain of significant difficulty in gait and pain in the legs or arms discredits Plaintiff's allegations of pain, as this conclusion overlooks the fact that Plaintiff's allegations include pain in her back, neck, and head, as well as in her arms and legs, and that such allegations have been consistent throughout the entire medical record.  Furthermore, the fact that

33

Plaintiff may not have complained of significant *weakness* in her arms and legs does not necessarily support the conclusion that Plaintiff did not suffer disabling *pain* in her arms and legs.

The ALJ cited Dr. Vandevender's report that Plaintiff appeared "alert and pleasant" during a visit to Dr. Vandevender in August 2006 (Tr. 301), but the ALJ provided no explanation of how Plaintiff's presentation at a single visit to her doctor weighed against the consistency of Plaintiff's allegations, or how it otherwise undermines Plaintiff's credibility.

Because the ALJ's objective medical bases for supporting his observations of Plaintiff at her hearing are not well-taken, the ALJ's observations stray into the realm of an impermissible basis for discrediting Plaintiff's subjective statements of pain and side-effects from her medications.  *See Nelms v. Gardner*, 386 F.2d 971, 973 (6th Cir. 1967) (explaining that it was error for the ALJ to base his decision on his observations that the plaintiff's weight had remained constant, there were no signs of atrophy, and that the plaintiff did not appear to suffer joint deformity or ankylosis, without disclosing an objective source of this information:  "While this standard was not used to contradict, or discredit, any medical evidence in the record . . . it goes to the heart of appellant's principal complaint of continuous back pain, and is a matter, not only not of common knowledge, but of debatable validity").

Finally, the ALJ indicated that Plaintiff's credibility was "weakened somewhat by the fact that her work record is not particularly good," as "her posted earnings are low and consistent with generally part-time and/or sporadic work," (Tr. 302); however, the ALJ again fails to articulate how this work history undermines Plaintiff's credibility.

34

In sum, the ALJ's analysis of Plaintiff's credibility is troubling because it is based largely on an inaccurate and selective analysis of the record evidence; it does not address the consistency of Plaintiff's complaints of pain throughout her entire medical record despite ongoing pain treatment; and it overlooks the consistency of Plaintiff's treating physicians' diagnoses and reports of Plaintiff's pain.  The ALJ has not articulated sufficient reasons to justify the weight he gave to Plaintiff's subjective statements of her symptoms and impairments.  Therefore, remand is necessary so that the ALJ may reevaluate and clarify the bases for his assessment of Plaintiff's credibility.

## VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED to the Social Security Administration for further proceedings.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge


Date:  March 14, 2011

35